OPINION
{¶ 1} Appellant, Nicholas Rock, appeals from the July 9, 2004 judgment of the Lake County Court of Common Pleas.
 {¶ 2} On January 14, 2004, appellant was indicted by the grand jury for count one, reckless homicide, a third degree felony, in violation of R.C. 2903.041, and count two, involuntary manslaughter, a third degree felony, in violation of R.C. 2903.04(B).
 {¶ 3} On February 17, 2004, appellant filed a motion to suppress the statements he had given to Lake County Sheriff Detective Pat Paterson ("Detective Paterson") on August 14, 2003 and August 25, 2003. A suppression hearing was held on April 22, 2004, and the court overruled the motion. A jury trial commenced on June 2, 2004.
 {¶ 4} The evidence revealed that the Lake County Fair Board ("LCFB") is made up of members of the Lake County Agricultural Society ("LCAS"), which manages and operates the Lake County fairgrounds. The LCFB is responsible for putting on the Lake County fair. The board includes Robert Dawson ("Dawson") as president, Richard Parker ("Parker") as chairman of the grounds committee, and appellant as the year-round fair electrician. He was previously a supervisor for Cleveland Electric Illuminating, now the Illuminating Company ("IC"). He has done outside electrical work for the LCFB for forty-three years.
 {¶ 5} The 2003 fair ran from August 12, 2003, to August 18, 2003. Amusements of Buffalo, Inc. ("Amusements") provided portable rides, and a contract between the LCFB and Amusements stated that Amusements would provide generating power for the rides, but if beneficial to both parties, Amusements would use public power and pay for its use. One of Amusements' rides was a bumper-car ride called the Scooter, manufactured by Majestic Manufacturing, Inc. ("Majestic") and owned by Mr. Chaffee ("Chaffee"). As part of this ride, Majestic provides a four-wire power cable (hot red, hot black, white neutral, and green ground), but relies on the owner to determine how it is used. The cable is made to connect at one end to the ride's "main service disconnect box" ("disconnect box"), which has a shunt-trip breaker box switch that can be manually tripped.[1] There is also an emergency stop button at the ride operator's station which, if pushed, cuts off all power to the ride. The other end of the cable is manufactured to go directly into a disconnect box connected to a main power source.[2] Although the green wire is intended to be connected to a ground source, if the ride itself is connected to an earth ground, this grounds the ride, but not the cable between the ride disconnect box and the power source.
 {¶ 6} Power to the fairgrounds is provided by the IC through two systems. Electricity comes into primary 4,800-volt systems, and is reduced down to 120-volt, 240-volt, 240-volt three phase, and 480-volt three phase. These reduced wires are called secondary voltage distribution systems. Some of the primary and secondary systems on the fairgrounds, as well as the power poles, are owned by the LCAS. The National Electric Safety Code ("NESC") governs the lines, equipment and practices of a public or private supply utility. Therefore, the LCAS is governed by the NESC with regard to its owned distribution systems. The National Electric Code ("NEC") governs wiring requirements beyond the service point (the point where a supply utility makes a physical attachment to a customer-owned facility). Thus, where primary and secondary systems on the fairgrounds are owned by the IC, the LCAS is governed by the NEC with regard to anything beyond the IC's service point. The NEC has a specific article — Article 525 — that applies to "Carnivals, circuses, fairs, seminars, and events." Another article — Article 250 — deals with grounding requirements.
 {¶ 7} Where a secondary system is owned by the IC, the customer typically installs a service disconnect box on the pole, and then the IC provides a service drop (a line down from the top of the pole, also called a drip line) to the disconnect box. The IC does not permit service connection at the top of its poles. The LCFB has permitted connections at the top of the pole in past years.
 {¶ 8} Prior to the opening of a fair, the Ohio Department of Agriculture ("ODA") is required to inspect the rides, and in 2003, three ODA inspectors inspected the rides. Most of the rides, as in previous years, used portable generators. A few rides, including the Scooter, were in the area of the livestock pavilion. These rides could not use generators because the smoke and noise bothered the animals, and therefore they had to be connected to a power source. The LCFB considered appellant the member responsible for connecting these rides to power. Appellant always hooked the concessions up to power, but he never connected any rides to power except for the Scooter. Appellant was not a certified electrician at the time of the fair, nor was he required to be one.
 {¶ 9} Before the 2003 fair opened, appellant was approached by a woman identifying herself as the ride manager's wife and was requested to connect the Scooter to power. After asking her if the ride was grounded, appellant believed that it was grounded with an eight-foot grounding rod through the frame of the ride. The plan, from the beginning, was to hook the ride's cable to the top of a utility pole that was ten to fifteen feet away from the ride. Appellant stated, "I hooked that ride up other years because it was away from the generator and [the LCFB] asked me to hook that up there." So, he retrieved his bucket truck and proceeded to the ride.
 {¶ 10} When he arrived at the Scooter, two young males instructed him how they wanted it hooked up. He went to the pole, which the IC could not later determine if it, or the LCAS, owned. At the base of the pole were four disconnect boxes, with a drop line connected to them. From the bottom of the disconnect boxes, copper wire ran down and attached to a ground rod, grounding the boxes. Appellant proceeded to the top of the pole, where he spliced into the 240-volt power lines using split volt connectors. Because at the top of the pole there was only a three-wire service (red, black and neutral), there was nothing to which to connect the green wire. He folded the green wire around so it did not short anything, and tied it to the white line to help support the cable. He tested the voltage of the connections with a tester. When he was done, he again talked with the two males, who thereafter went to the panel box, then returned and spoke to him. He believed at that time that there was a safe connection using the three-wire system, and that the ride was properly grounded because the ride itself was grounded, and because (1) the wire to which the neutral wire was connected at the top of the pole was also connected to a transformer two poles away, which grounds the neutral and has fuses that will blow if a fault condition occurs (but appellant was not sure what it would take to blow them), and (2) he had connected the neutral at the top of the drop line, which was connected to the four disconnect boxes that were grounded by a ground rod. Appellant also believed that he was not violating any ODA rules. He further believed that the ODA's Ride Safety Division procedures required that every ride itself be grounded.
 {¶ 11} He claimed no knowledge that the NEC requires that all ride hookups be connected to a main power disconnect in addition to the ride disconnect. He could not connect the cable to any of the four disconnect boxes at the base of the pole because they all contained 100-amp fuses, and this ride required 157-amps. He could not replace these fuses with 200-amp fuses because they would not fit in the boxes. He felt that it was not feasible or necessary to install another disconnect box on the pole.
 {¶ 12} On the opening day of the fair, several people observed the power go off on the Scooter while they were waiting in line, and some saw the young ride operator walk to a circuit breaker box on a pole behind the ride (testimony established that this was not the pole to which the ride cable was connected, but another nearby pole with only one breaker box). The operator seemed to push up a handle in the box to reset the breaker, whereupon he walked back to his control station and started the ride back up.[3] That day, several people were shocked at or near the ride, in intensities that ranged from a tingling sensation to a good shock causing them to jump.
 {¶ 13} The next day, on August 13, 2003, seventeen-year-old David Yannie ("Yannie") was operating the Scooter. Several people, including himself, got shocked, and he repeatedly reported this to the ride supervisors and ride owner, who came out, checked the ride, and when they did not get shocked, told Yannie to keep the ride running. One woman, who along with her daughter had been consecutively shocked twice, reported this to a deputy sheriff on the fairgrounds.
 {¶ 14} Shortly before 10:00 p.m., eight-year-old Greyson Yoe ("Greyson") arrived at the Scooter with his father. While in line, he and several children were standing on the aluminum deck of the ride, leaning on the metal railing and watching the ride in operation. A child next to him heard Greyson cry for help and she told him to let go of the railing but he could not do so. He slumped down to his knees, still holding onto the railing. Parents shouted to shut down the ride, but Yannie did not do so right away. He eventually shut it down and by then Greyson had fallen to the ground. His father called 9-1-1, and Lake Country Fire Department ("LCFD") paramedics arrived shortly thereafter. He was taken to the hospital, later life-flighted to Metro Health, and then taken to Hospice of Western Reserve, where he died on September 2, 2004. An autopsy revealed that both forearms received electrical injury, and the coroner's report indicated that an electric current must have gone across the chest and made the heart stop beating. Lack of oxygen caused brain death. The cause of death was found to be electrocution.
 {¶ 15} An intense investigation began the next day involving the Lake County Sheriff's Office, the LCFD, the ODA, the LCFB, the IC, the ride owner, various retained experts, and the Lake County building inspector. They inspected the ride and the power connection, and spoke to various involved parties, including Dawson, Parker, appellant, Chaffee, Yannie, and the ODA inspectors who had inspected the ride before the fair opened.
 {¶ 16} With regard to the cable connection, there was a general consensus among those who testified that: (1) the 120-foot ride cable was connected at one end at the ride's disconnect box, snaked through the grass to the base of the utility pole, wrapped around a piece of plywood attached to the pole, bypassed the four properly grounded disconnect boxes that were mounted on the plywood, and went to the top of the pole where the black, red, and neutral wires, but not the green wire, were connected, (2) there was no grounding in place to protect the cable between the ride disconnect box and the power source, and (3) therefore, the connection was improper and provided no grounding protection to live current in the cable between the ride disconnect box and the power source.
 {¶ 17} There was also a general consensus as to the ride itself that it: (1) had numerous defects, (2) had not been grounded, and (3) therefore, was unprotected in the event of a fault current.
 {¶ 18} Ralph Dolence, ("Dolence"), an electrical expert from whom the LCFD requested assistance, and who testified as the state's witness at trial, opined that the connection of the cable to the power source was not a proper service connect because there was no grounding for the ride or the cable. He stated that if appellant would have dropped a wire from the green wire at the top of the cable down to the grounding rod at the pole's bottom, it would have provided grounding, although not in compliance with standards. He also stated that appellant could have installed a new disconnect box on the pole.
 {¶ 19} Dolence observed the ride's defects, but said that none had caused the electrical fault (current leakage). The ride had a 150-amp disconnect box, so the ride's power could be shut off manually, but without grounding, this would not happen automatically.
 {¶ 20} The IC was contacted to disconnect the cable at the pole, but when they were unable to respond, appellant was asked to do the disconnect. Once the ride was disconnected from power, Dolence used a portable gas generator, connected to a ground rod, to give power back to the ride. He then began testing the ride to find the source of the faulty current that shocked riders and electrocuted Greyson. He connected one end of a multi-meter to the ground rod, and the other end to the ride's chassis, and observed 12.7 volts coming from a fault current. He then systematically isolated and tested each circuit. When he got to a 20-amp circuit breaker that had two different circuits improperly connected to one breaker, he discovered that when he removed one of the wires, the voltage cleared, telling him that this was the line from which the fault was coming. When he asked Chaffee to what this line was connected, Chaffee led him onto the roof, to a weather-tight junction box that had once serviced a light panel. The black wire inside the metal box had come loose, and this live wire flopped around inside the box whenever the ride was in operation. This caused the wire to sometimes hit the box, causing arcing. When it made contact, it created the fault current that had shocked people. The degree of shock they received depended on how far away the person was from the box, and other factors such as the individual's body type and whether the person was perspiring, the type of shoes the person was wearing, and the amount of humidity in the air. It was determined that Greyson, who had been standing on the metal deck, had put one of his feet down onto the earth, and his leg had acted as a ground, causing the current to pass through him. If the ride had been grounded, the fault current would have created a low resistance path to the ground, which would have been recognized as a problem and caused the 20-amp circuit breaker to trip, cutting off the circuit and clearing the fault. Once Dolence pulled the black wire off the box, the fault disappeared.
 {¶ 21} Dolence opined that if the cable's green wire at the top of the pole had been grounded at the source (dropping a wire from the green wire to the ground rod) or at a disconnect box, it would have provided ground continuity to the ride disconnect box. He did not specifically opine whether this "ground continuity" — in a case where the ride itself is not grounded — would have been sufficient in the event of a fault current on the ride, to trip either the ride disconnect box or a service disconnect at the pole if one had been installed, and therefore cut off power to the ride.
 {¶ 22} The jury returned guilty verdicts on counts one and two. A sentencing hearing was held on July 7, 2004. In a judgment entry dated July 9, 2004, the trial court sentenced appellant to two years of community control, thirty days in the Lake County jail on each count of the indictment, to be served concurrently, two hundred hours of community service, and restitution in the amount of $55,000. The court further prohibited appellant from doing any further electrical work for anyone. It is from that judgment that appellant filed a timely notice of appeal, and makes the following assignments of error:
 {¶ 23} "[1.] The trial court erred in denying [appellant's] motion to suppress each of two statements made by [appellant] on August 14, 2003 and August 25, 2003.
 {¶ 24} "[2.] The trial court erred in denying the motion of [appellant] at the conclusion of the state's case to dismiss count two of the indictment, involuntary manslaughter.
 {¶ 25} "[3.] The trial court erred in permitting the state's alleged expert witness, Ralph Dolence, to testify and render his opinions regarding electrical matters without his having possessed the qualifications to qualify him as an expert."
 {¶ 26} In his first assignment of error, appellant argues that the statements he made to Detective Paterson, in violation of his Miranda
rights, should have been suppressed.
 {¶ 27} In State v. Curtis, 11th Dist. No. 2002-A-0025, 2003-Ohio-6085, at ¶ 16, we stated:
 {¶ 28} "[a]t a suppression hearing, the trial court, acting in its role as the trier of fact, is in the best position to resolve questions of fact and evaluate the credibility of witnesses. State v. Mills
(1992), 62 Ohio St.3d 357, 366 * * *. A trial court's decision * * * will not be reversed if it is supported by competent, credible evidence. Statev. Guysinger (1993), 86 Ohio App.3d 592, 594 * * *. An appellate court must independently determine, without deferring to the trial court's conclusions, whether the facts meet the applicable standard, as a matter of law. State v. Klein (1991), 73 Ohio App.3d 486, 488 * * *." (Parallel citations omitted.)
 {¶ 29} In Miranda v. Arizona (1966), 384 U.S. 436, 444, the United States Supreme Court held that "the prosecution may not use statements * * * stemming from custodial interrogation of the defendant unless * * * [p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.
 {¶ 30} The United States Supreme Court later described "in custody" as either a "`formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler (1983),463 U.S. 1121, 1125. A noncustodial situation does not become a custodial one simply because the person is questioned in a coercive environment such as a station house, or because the person is the focus of a criminal investigation. Id. at 1124-1125, citing Oregon v. Mathiason (1977),429 U.S. 492, 495. In making an "in custody" determination, courts must focus on how a reasonable person in the detainee's position would have felt if he had been in the same position. State v. Gaston (1996),110 Ohio App.3d 835, 842, citing Berkemer v. McCarty (1984),468 U.S. 420, 426. The court must examine all of the circumstances surrounding the interrogation. State v. Adams, 11th Dist. No. 2003-T-0064, 2005-Ohio-348, at ¶ 46.
 {¶ 31} The United States Supreme Court in Rhode Island v. Innis
(1980), 446 U.S. 291, 301, defined "interrogation" as referring "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."
 {¶ 32} The record shows that the morning after the electrocution, Detective Paterson reported to the fairgrounds to assist in the investigation. He met with Lieutenant Ronald Walters ("Lieutenant Walters") and others who were participating in the investigation. They were searching for the cause of the incident, and identifying individuals involved with the ride's set up. Detective Paterson approached appellant while he was driving a golf cart and asked if he would talk to him. Appellant consented and they walked to the substation at the fairgrounds. They took a seat and Detective Paterson asked him some basic questions about his affiliation with the LCFB and how appellant had hooked up the Scooter. They had a brief conversation, after which appellant was asked to write out a statement about what they had discussed. Appellant agreed and Detective Paterson provided him with a Lake County Sheriff's Office "Voluntary Statement Form." It took appellant about fifteen minutes to hand write his one-page statement, which he then signed after first having an opportunity to review it.
 {¶ 33} On August 25, 2003, Detective Paterson returned to the fairgrounds with Lieutenant Walters to see if they could find appellant. When located, they asked if he would come to the sheriff's office to answer additional questions. He agreed and followed them there in his truck. Detective Paterson took appellant to an interview room, had him take a seat, and offered him coffee. The door was left open, and he was never told he could not leave. Detective Paterson said he wanted to clarify appellant's contractual affiliation with the LCFB and to further discuss how appellant had hooked up the Scooter. After a ten-minute conversation, Detective Paterson prepared a typewritten document about the conversation. This was done on a computer, with the screen visible to appellant. Detective Paterson asked him basic questions regarding the LCFB and the ride connection and typed in his answers. Detective Paterson did not assist appellant in answering the questions, nor confront him about any inconsistencies with his prior statement. Detective Paterson typed the answers verbatim. This process took about forty-five minutes. During this time, appellant appeared casual and cordial. Although appellant was seventy-nine at the time, he was oriented to time, person and place. Detective Paterson printed the statement and asked appellant to review it before signing it. Appellant did not request any changes. Detective Paterson thanked appellant for his time, and as he departed, Lieutenant Walters, who had known appellant and his wife for about eighteen years, shook his hand and thanked him for coming.
 {¶ 34} These facts show that appellant was not in custody for Miranda
purposes at the time of either interview. He had not been formally arrested at either time. His freedom was not in any way curtailed. On both occasions, he volunteered to go with Detective Paterson. The first interview was at the fairgrounds. Although the second interview was at the sheriff's office, appellant had not been transported there by the officers and had appeared casual and helpful during the interview. A reasonable person in appellant's position would not have felt that he was in custody.
 {¶ 35} In addition, there was no police questioning that rose to the level of a Miranda interrogation. The record does not show that Detective Paterson's questions or actions during the interviews were intended to solicit incriminating responses. Both interviews preceding the taking of the statements were brief, the questions asked were basic and short, and after the statements were completed, appellant had the opportunity to review them and make corrections.
 {¶ 36} Although appellant argues that the detectives were conducting a criminal investigation in which he was a focus, per Beheler, this would not turn a noncustodial situation into a custodial one.
 {¶ 37} Since there were no custodial interrogations on August 14, 2003 or August 25, 2003, Miranda warnings were not triggered. Therefore, appellant's first assignment of error is overruled.
 {¶ 38} In appellant's second assignment of error, he alleges that the trial court erred in overruling his motion to dismiss counts one and two of the indictment.
 {¶ 39} Based on the limited argument of counsel as to count one, reckless homicide, and after viewing the probative evidence in the record and the inferences drawn from such evidence in the light most favorable to the prosecution, we conclude that the jury could have found present all of the elements of reckless homicide beyond a reasonable doubt.
 {¶ 40} As to count two, involuntary manslaughter, appellant argues that he was improperly convicted under R.C. 2903.04(B), because (1) Section 901:9-1-06(E) of the Ohio Administrative Code is not a "regulatory offense," (2) even if it is a regulatory offense, it does not apply to him, and (3) there is no evidence that he "aided and abetted" in a regulatory offense.
 {¶ 41} The charged regulation, Section 901:9-01-06(E) of the Ohio Administrative Code, in effect at the time, stated:
 {¶ 42} "All electrical wires leading to and from a ride or device must be protected and insulated so as to prevent shock hazard. All electrical equipment must be properly grounded. All electrical junction boxes and generator panels/doors shall be locked or sealed and properly identified as such. All wiring shall conform to manufacturer's recommended practices."
 {¶ 43} In determining if this provision is a "regulatory offense," we start by examining the pertinent statute. R.C. 2903.04(B), which took effect March 23, 2000, provides: "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor * * *."
 {¶ 44} Prior to this amendment, "regulatory offense" was not included in R.C. 2903.04(B), nor was it defined anywhere in the Ohio statutes before or after the amendment. Although the definitions for "felony," "misdemeanor," and "minor misdemeanor," were set out in R.C. 2901.02, Classification of Offenses, this section was not amended with the amendment of R.C. 2903.04(B).[4]
 {¶ 45} The Senate bill that resulted in the R.C. 2903.04(B), Am. Sub. S.B. 107, not only amended R.C. 2903.04(B), but also several other criminal statutes. Appellee correctly states that the Ohio Legislative Service Commission, in the bill's "Final Bill Analysis," states that it does not define regulatory offense, but it appears to refer to a regulatory offense contemplated by the Criminal Sentencing Commission's Misdemeanor Report. See Ohio Legislative Service Commission, 123rd Final Bill Analysis, Am. Sub. S.B. 107.
 {¶ 46} Sentencing Commission's proposed definition provided that a regulatory offense means a criminal offense, but one that is not a minor misdemeanor involving conduct injurious to business, government, or public safety where only a monetary penalty is authorized.[5]
 {¶ 47} However, as appellant and appellee both note, the General Assembly never adopted this proposed definition. Moreover, several of the new provisions of S.B. 107, as pertaining to other statutes, specifically defined or redefined new terms. See Ohio Legislative Service Commission, 123rd Final Bill Analysis, Am. Sub. S.B. 107
 {¶ 48} Since the legislature has not supplied a definition of this term, we will look elsewhere.[6] In Morissette v. U.S. (1952),342 U.S. 246, the United States Supreme Court addressed both civil liability for, and the multitude of prosecutions resulting from criminal sanctions being applied to, statutes or administrative regulations deemed to be "public welfare offenses":
 {¶ 49} "[t]hese cases do not fit neatly into any * * * accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions * * * but are in thenature of neglect where the law requires care, or inaction where itimposes a duty." Id. at 255. (Emphasis added.)
 {¶ 50} The Supreme Court explained that specific intent was not a necessary element of such offenses, since "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." Id. In addition, the Court described the penalties for such offenses as "relatively small, and conviction does no grave damage to an offender's reputation." Id.
 {¶ 51} In Staples v. U.S. (1994), 511 U.S. 600, 616, the United States Supreme Court approved of Morissette, and further stated that it recognized such "public welfare offenses" in limited circumstances, usually involving statutes that regulate potentially harmful or injurious items, and further noted that "the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties * * *."
 {¶ 52} In Ohio, courts have consistently categorized "public welfare offenses" as those whose purpose is to protect the health, safety, and well-being of the community. See, e.g., Bates Amusements, Inc., v. OhioDept. of Agriculture (2003), 7th Dist. No. 02 JE 18, 2003-Ohio-7013;State v. Shaffer (1996), 114 Ohio App.3d, 97; State v. Buehler FoodMarkets, Inc. (1989), 50 Ohio App.3d 29.
 {¶ 53} The D.O.A's statutory framework relating to amusement ride safety is found in R.C. Chapter 1711. R.C. 1711.53(B) specifically authorizes the ODA director to promulgate rules, inter alia, "for the safe operation and inspection of all amusement rides as are necessary for amusement ride safety and for the protection of the general public."
 {¶ 54} Section 901:9-01-06(E) of the Ohio Administrative Code clearly has a purpose to protect the health, safety, and well-being of the community. "Shock hazard," as discussed in that regulation, is certainly a viable concern in this regard. Therefore, we hold that Section 901:9-01-06(E) of the Ohio Administrative Code is a "regulatory offense."[7]
 {¶ 55} Nonetheless, this regulatory offense does not apply to appellant. In reviewing R.C. Chapter 1711, particularly Sections 1711.50
to 1711.57 (hereafter, "Amusement Rides Provisions"), Chapter 901:1 of the Ohio Administrative Code, and the penalty provisions of these chapters, it is clear that appellant is not an offender intended to be governed by this statutory scheme.
 {¶ 56} The pertinent sections of the Amusement Ride Provisions dealing with requirements and prohibitions consistently refer to the "owner," sometimes to the "operators," and once to the "rider."[8] For example, each subsection of R.C. 1711.53, titled "Amusement Ride Owner to Apply for Operating Permit; Inspection, Safety Rules, Fees, Inspection Fund," refers specifically to the "owner" when setting out the interactions and responsibilities of the owner and the ODA director. R.C. 1711.53(B) requires the director to publish any rules it adopts in pamphlet form and furnish a copy to each owner of an amusement ride. R.C. 1711.56(A), which deals with fines, provides that "[t]he director * * * may fine any owner
of an amusement ride for a violation of sections 1711.50 to 1711.57 * * *." (Emphasis added.)
 {¶ 57} Since the amusement ride statutes clearly designate who is covered by them, the regulations would follow suit, unless the intent to depart from the statutory scheme is clear. A review of Chapter 901:1 of the Ohio Administrative Code shows that it applies primarily to "owners." There are only two provisions that could arguably apply to third parties such as appellant. Section 901:9-1-03 of the Ohio Administrative Code provides, that:
 {¶ 58} "[n]o person shall interfere with any inspector * * * or operate or cause to be operated an amusement ride * * * under any of the following conditions:
 {¶ 59} "(C) When the amusement ride * * * is in an unsafe condition that could cause a hazard to riders, employees or the public[.]
 {¶ 60} "(F) When the amusement ride does not conform to the manufacturer's required operation and maintenance procedure * * *."
 {¶ 61} By using the words "no person," the ODA clearly demonstrated its intent to depart from its practice of limiting the application of the regulations to definite categories of individuals, at least regarding anyone who interfered with an inspection. As to the prohibition that no person shall operate or cause to be operated an amusement ride, its construction is more limited by the way the ODA has defined the terms stemming from the root word "operate." R.C. 1711.50(E) defines "operation" as "the use or operation, or both, of an amusement ride with riders." Section 901:9-1-08(G) of the Ohio Administrative Code defines "operator" as "the person having direct control of the starting, stopping, or speed of an amusement ride." When we consider these definitions, it is clear that the ODA intended that only certain persons fall under the mandates of Section 901:9-1-03 of the Ohio Administrative Code: those who interfere with an inspection, those who actually operate the ride, and those who indirectly operate the ride, such as the owner. See, e.g., Bates Amusements, supra (court upheld owner liability for operator's intoxication).
 {¶ 62} The only other provision not specifying to whom it applies is Section 901:9-1-06 of the Ohio Administrative Code, under which appellant was charged, and which reads: "Additional operation procedures for amusement rides and devices." (Emphasis added.) This rule contains several mandatory procedures in operating a ride, but does not always state who is responsible for complying with these procedures. However, reading Subsection (E) of this regulation — the specific subsection under which appellant was charged — in conjunction with the other subsections of the regulation, it becomes obvious that these provisions are designed to be followed by owners and operators rather than by third parties.[9]
Moreover, reading together the four requirements of Subsection (E) — that wiring to and from the ride be protected, that junction boxes and generator doors be locked or sealed, that wiring be conforming recommended practices, and that electrical equipment be grounded — further evidences the intent that the requirements go to the ride owner.[10]
 {¶ 63} Likewise, the ODA's intent in promulgating these two provisions was revealed at trial. On redirect examination, Jason Foreman, a ride and game inspector for twenty years at the ODA's Division of Amusement Ride Safety, indicated that he was familiar with the ODA's inspector's handbook, § 80.13, ¶ 1, dealing with the ODA's authority: "The authority having jurisdiction shall be permitted to render interpretations of the Code in order to provide clarification of its requirements." James Truex ("Truex"), Chief of the ODA's Division of Amusement Ride Safety, which division is responsible for inspection and licensing of amusement rides, presented uncontested testimony "about the Ohio Department of Agriculture's regulatory offenses that apply to amusement park rides and fairs and festivals." His testimony revealed that "[t]he law puts it on the ride owner to ensure that the ride is set up properly and inspected on a daily basis when it is used[,]" and that "the law says it is ultimately the ride owner's responsibility to ensure that a ride is maintained, set up, [and] used properly." On cross-examination, when the state twice tried to solicit an affirmative response that the fair electrician must comply completely with the ODA's regulations when he is utilized by the ride owner to make an electrical connection for the ride, Truex explained that he would have to comply with the NEC standards, but Truex would not affirm that he was bound by the ODA regulations, although the ODA "assum[ed] that it will be done correctly."
 {¶ 64} In addition, the penalties for violations of the Amusement Ride Provisions are found in R.C. 1711.56(A), which provides:
 {¶ 65} "[t]he director of agriculture may fine any owner of an amusement ride for a violation of Sections 1711.50 to 1711.57 of the Revised Code or any rules issued under division (B) of Section 1711.53 of the Revised Code * * *. In addition, the director may order the revocation of an owner's permit * * *." (Emphasis added.)
 {¶ 66} The penalty provisions of Chapter 901:9 of the Ohio Administrative Code are found in 901:9-1-09, which states that "all fines are assessed on the owner of the ride, and shall be paid by the owner * * *." (Emphasis added.)
 {¶ 67} For these reasons, we conclude that Section 901:9-01-06(E) of the Ohio Revised Code does not apply to appellant.
 {¶ 68} Finally, the state's argument that appellant "aided and abetted" the ride owner, and therefore is liable for violations under the regulatory offense, is unfounded. To establish guilt as an aider or abetter under R.C. 2903.04(B), the state was required to show that appellant, using the culpable mental state if one is required for the commission of the principal offense, "supported, assisted, encouraged, cooperated with, advised, or incited" the ride owner in committing the offense of not properly grounding the ride's electrical equipment. 4-523 OJI § 523.03; State v. Monroe (1992), 81 Ohio App.3d 745, 747.
 {¶ 69} Prior case law found that legislative silence regarding a statute's mens rea indicated a purpose to impose strict liability. The Ohio legislature, by statute, modified this rule in R.C. 2901.21(B), which provides that when the statute does not specify the degree of culpability and plainly indicates the purpose to impose strict liability, then culpability is not required. Buehler at 30-31. Where the statute does not plainly indicate a purpose to impose strict liability, then the requisite degree of culpability is recklessness. Id. Section 901:9-1-06(E) of the Ohio Administrative Code does not specify any degree of culpability. However, it does not indicate a purpose to impose strict liability. Therefore, the requisite degree of culpability is recklessness. Reckless is defined in R.C 2901.22(C) as follows:
 {¶ 70} "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or likely to be of a certain nature. * * *"
 {¶ 71} There was no evidence in the record indicating that appellant, with heedless indifference to the consequences, and while perversely disregarding a known risk, supported, assisted, encouraged, cooperated with, advised, or incited the ride owner in committing the offense of not properly grounding the ride's electrical equipment. This certainly is not a situation where appellant got together with Chaffee and they figured out a way to avoid grounding the ride, knowing what could happen. In fact, appellant testified that he had not even met Chaffee at the time he connected the power. During the fairs, he had hooked up only one ride: the Scooter. The LCFB asked him to connect it "up there." The manager's wife indicated that the ride was grounded. Appellant was unaware that the law required him to connect to a disconnect box even when the ride had one and was grounded. There were no disconnect boxes near the ride which would support the ride's amperage. There was no evidence that appellant was furnished a copy of Chapter 901:9 of the Ohio Administrative Code, which must be provided to ride owners, and which contains the provision appellant is claimed to have aided the ride owner to violate.
 {¶ 72} For the foregoing reasons, the trial court erred in overruling appellant's motion to dismiss count two, and appellant's second assignment of error is well-taken.
 {¶ 73} In appellant's third assignment of error, he claims that Dolence — the state's expert witness — was not sufficiently qualified in electrical matters to allow him to render expert opinions.
 {¶ 74} The trial court determines whether a person qualifies as an expert, and such a determination will not be overturned absent an abuse of discretion. State v. Williams (1983), 4 Ohio St.3d 53, 58. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable, rather than an error of law or judgment.State v. Armstrong, 11th Dist. Nos. 2001-T-0120 and 2002-T-0071,2004-Ohio-5635, at ¶ 52.
 {¶ 75} Evid.R. 702 provides that a witness may testify if all of the following apply:
 {¶ 76} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 77} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 78} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."
 {¶ 79} Dolence's testimony regarding electrical technology, procedures, and standards clearly went beyond the knowledge or experience possessed by lay persons. His qualifications included several hundred courses relating to electricity, electrocution, and wiring systems. He conducted several hundred seminars, including classes on basic electronics and improved electronic devices. He wrote a book titled "Electricity in the Fire Service." He is a licensed electrician, and is also licensed in forensics and radiography. He worked at Radiance Electric as an electrical draftsman, and was a full-time and part-time firefighter for the South Euclid and Willowick Fire Departments. He owns a forensic laboratory called Dolence Electrical Technical Consultants, which investigates, inter alia, the causes and origin of electrical incidents. He has testified about a hundred and fifty times as an expert about electrocutions and electrical injuries. His testimony was based on his vast training and experience, and also a detailed knowledge of the electrical industry standards.
 {¶ 80} Appellant notes that Dolence's educational training consists only of a high school diploma and short courses. However, neither special education nor certification is necessary to confer expert status upon a witness. State v. Baston (1999), 85 Ohio St.3d 418, 423.
 {¶ 81} Based on the record, we conclude that the trial court did not abuse its discretion in qualifying Dolence as an expert witness, and appellant's third assignment is overruled.
 {¶ 82} Therefore, the judgment of the trial court is affirmed as to the first and third assignments of error. Regarding the second assignment of error, the judgment of the trial court is affirmed as to the conviction for reckless homicide, but is reversed as to the conviction for involuntary manslaughter, and on that count, judgment is entered for appellant.
Rice, J. and O'Toole, J., concur.
[1] A "main service disconnect box" contains a breaker control (or fuse) that will trip (or blow) if an electric fault occurs. In order for this to trip (or blow), it must be able to determine that there is a problem. This is provided when there is a "low resistance" (or "low impedance") path to ground, meaning the fault current goes to ground. If there is no ground in place to which the fault can go (such as a ground rod driven into the earth and connected to the disconnect box by solid copper wiring), the breaker (or fuse) cannot tell the difference between a regular current and a fault current.
[2] At the end of each cable wire is a type of brass terminator, called a cam lock, that fits into the disconnect box. In this case, these had been removed from the red, black and white wires, and were found lying on the ground by the Scooter. Testimony did not reveal when or by whom they were removed.
[3] Trial testimony never resolved whether the ride was also connected to the breaker box on this pole, or if such a connection impacted the cable connection at the other pole.
[4] Interestingly, R.C. 2901.02(A), as amended January 1, 2004, provides that "[o]ffenses include aggravated murder, murder, felonies of the first, second, third, fourth, and fifth degree, misdemeanors of the first, second, third, and fourth degree, minor misdemeanors, and offenses not specifically classified." "Offenses not specifically classified" are defined in R.C. 2901.02(E) through (G) as felonies, misdemeanors, and minor misdemeanors with certain penalties. Therefore, pursuant to R.C.2901.02(A), "regulatory offenses" are not even "offenses" under the Ohio Revised Code, which puts R.C. 2903.04(B) in direct conflict with R.C.2901.02(A).
[5] If this court were to adopt that definition, as did the trial court, without first reviewing the intent of the legislative body that promulgated the rule (the ODA), our discussion would end here, since Section 901:9-1-06(E) of the Ohio Administrative Code is a civil
provision, providing for civil administrative remedies and penalties, see, e.g., R.C. 1711.56 and Section 901:9-1-02 of the Ohio Administrative Code, while the Sentencing Commission definition applies to criminal
offenses.
[6] Cases dealing with this type of offense often use the terms "regulatory offense," "regulatory crime," "public welfare offense" and "public welfare crime" interchangeably.
[7] Although appellant does not challenge the constitutionality of R.C. 2903.04(B), as amended, we suggest that the new statute is problematic in that it incorporates a civil regulatory offense into a criminal statute that imposes penalties far above those intended for such offenses. See Morissette at 255, Staples at 616.
[8] R.C. 1711.531, which was recently enacted and does not take effect until January 1, 2006, likewise sets out requirements for ride "owners" and "operators."
[9] For example, Subsection (A) requires that a numbered decal appear on the ride that matches the permit. Subsection (B) requires that the ride be under the control of a competent operator. Subsection (C) requires that fencing be provided to protect spectators from the action of the ride. Subsection (F) requires that rider restraints be provided with lap bars or seat belts. Subsection (G) requires that the "operator" exercise reasonable control over patrons. Subsection (H) requires that a fire extinguisher be readily accessible.
[10] Majestic, the Scooter's manufacturer, testified that the electric power cable was part of the ride equipment.