OPINION
{¶ 1} Appellant, Jamal D. Strickland, appeals from the December 9, 2004 judgment entry of the Trumbull County Court of Common Pleas, in which he was sentenced for aggravated robbery, kidnapping, and tampering with evidence.
 {¶ 2} On April 22, 2004, appellant was indicted by the Trumbull County Grand Jury on six counts: count one, aggravated robbery, a felony of the first degree, in violation of R.C.2911.01(A) and/or (3) and (C); count two, aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1) and/or (2) and (B); count three, kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(2) and/or (3) and (C); counts four and five, felonious assault, felonies of the second degree, in violation of R.C. 2903.11(A)(1) and (D) and2903.11(A)(2) and (D); and count six, tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1) and (B). On April 30, 2004, appellant entered a plea of not guilty on all counts.
 {¶ 3} On September 21, 2004, the prosecution moved for a nolle prosequi entry on count five, felonious assault pursuant to R.C. 2903.11(A)(2) and (D), which the trial entered on September 27, 2004. Subsequent to which, the parties agreed to renumber the counts in order to simplify the issues for the jury. Thus, count six, tampering with evidence, became count five.
 {¶ 4} A jury trial commenced on October 12, 2004. The facts revealed at trial are summarized in the following paragraphs.
 {¶ 5} Dennis McCormick ("McCormick"), a newspaper deliveryman for the Warren Tribune, testified that he delivered newspapers to Niles Book and News on the night of April 13, 2004, at approximately 3:30 or 3:45 a.m. As he pulled into the parking lot, he saw the clerk, Clarence Leet ("Leet"), lying on the floor. McCormick stated that Leet had his back to him and he thought that Leet might be working on something. When McCormick got out of his vehicle to go around to the side of his van to get the newspapers, he noticed that Leet was gone and he saw "a pool of blood" where his body had been. Believing that a robbery might still be in progress, he drove up the street to call 9-1-1. While he was on the phone with the police, he saw the light colored SUV, that he had seen parked outside the store, pass him on the street, heading east on Route 422, towards Girard. He testified that he then informed police that "at the light there at 46 [the light colored SUV] turned left and headed towards Howland."
 {¶ 6} Officer Tony Johnson ("Officer Johnson"), of the Niles Police Department, arrived at the scene first. He testified that he saw a white Ford Explorer leaving the scene, but he remained at the store to secure it, radioing to other officers the direction he saw the Explorer traveling. He found Leet covered "with blood all about his head, face, [and] shoulder area." After other officers arrived, they found a very large pool of blood covered up with newspapers, as well as a "drag mark of blood going to the rear of the store, a blood trail."
 {¶ 7} Leet was transported to St. Elizabeth Hospital and treated for life threatening injuries. Dr. Carlos Jimenez ("Dr. Jimenez"), the doctor who treated Leet in the emergency room, testified that Leet suffered a nasal bone fracture, a temporal bone fracture in his jaw, and that Leet had an intracranial bleed that was identified by a CAT scan. Dr. Jimenez's testimony made it clear that Leet's injuries, if untreated, carried "a substantial risk of death," resulted in "substantial and temporary incapacity," and were of such a nature that they would "cause acute pain that would lead to substantial suffering." Leet ended up spending a total of thirty-four days at St. Elizabeth and Hillside Rehabilitation Hospital.
 {¶ 8} Officer Craig Aurilio ("Officer Aurilio") and Officer Jaisan Holland ("Officer Holland"), both of the Niles Police Department, testified that they saw the white Explorer at the intersection of Route 422 and Route 46. They conducted a traffic stop of the vehicle. When appellant exited the vehicle, he had blood on his coat. Officer Holland testified that he found the following items in appellant's coat: thirty-six loose, pornographic DVDs, identified at trial as being property of Niles Book and News; a blank VHS tape, which was later discovered to be a surveillance tape from the store; a bloody paper towel that appellant admitted on cross-examination was the towel that he used to clean blood off of the victim; some loose cash in the amount of $65, which according to the store manager's testimony, is approximately the same amount of cash taken from the store on the night of the robbery; and a couple sets of keys in appellant's coat, one which was identified at trial as being the keys from the cash register at the store. Furthermore, the officers found a box of pornographic movies and magazines on the seat of the Ford Explorer. At trial, the store manager also identified the movies as being property of the store and stated that he could not identify the magazines as store property because they were not marked, but that they sold those magazines at the store.
 {¶ 9} Officer Holland further testified that he placed appellant in his cruiser and activated the dashboard video recorder. While transporting appellant to the police station, appellant informed Officer Holland that he had been set up by a "guy named Money." Appellant told Officer Holland that Money had stopped at the bookstore and assaulted Leet. Appellant claimed that he had tried to help Leet, but Leet swung at him and tried to punch him, so appellant punched him back. As they got closer to the police station, appellant asked Officer Holland if he "could talk to anybody about drugs in Niles and [try] to work out something as like to be an informant to get out of the situation."
 {¶ 10} At the station, Officer Holland watched the surveillance tape. He then confronted appellant, who then changed his story and told Officer Holland the "Italian Mafia" story, which provided the basis for his duress defense, detailed later in this opinion.
 {¶ 11} Appellant testified in his own defense. After stating that he had "been in crime all [his] life" and that he was not "trying to act like [he was] innocent," appellant admitted to the crimes. He further admitted on cross-examination that he grabbed Leet by the throat, punched him in the face, knocked him to the ground, dragged him to the back of the store and stomped on his face. He also admitted to stealing movies, magazines, and money (which was proven to be $65), as well as the surveillance tape.
 {¶ 12} Appellant testified about the "Italian Mafia" story. He explained that he came to Ohio to sell "weed" to a friend who wanted it. He stated that when he got to the Niles-Cortland exit, a man, whom he had never seen before, came to the window of his Ford Explorer, pointed a gun at him and stated, "don't do anything stupid, we're watching you, we have people with your family watching your family." He testified that this man made him drive to Niles Book and News and rob it, because the man "wanted a piece of the money that [he] owed them from when [he] was younger."
 {¶ 13} Appellant further explained that this debt arose from when he was eighteen years old and had been a car thief. He stated that "older Italians" had been the car-thief leaders. Appellant claims that he brought his cousin into the car-theft ring, and that his cousin ended up getting caught and telling the authorities about the theft ring. The "Italian men" blamed appellant for "the mistake," because he had brought his cousin into the ring. Appellant further maintains they made appellant responsible for $25,000 in damages for "the mistake" and that the amount had grown to $50,000 by April of 2004.
 {¶ 14} Appellant further testified that when he and the man got to the store, the man did not go into the store with him, but watched him from the vehicle. Appellant claims the man was still in his Explorer when he brought "stuff out to the truck" the first time. But, appellant stated that when he came back out the second time, the man was gone.
 {¶ 15} Appellant also admitted that this man did not tell him to beat Leet or to stomp on his head. He further admitted that when he went into the store, alone, that he did not inform Leet that someone was making him rob the store, nor did he ask Leet to call the police or help him in any way. Finally, he admitted that he did not attempt to borrow Leet's phone to call his family to see if they were okay or to call the police.
 {¶ 16} On cross-examination, appellant agreed with the prosecution that the adult bookstore was not a likely place to find $50,000, but maintained that he did not choose the site for the robbery; that this unidentified man chose the site.
 {¶ 17} On October 14, 2004, after three days of trial, the jury returned a verdict of guilty on the remaining counts. Appellant filed a motion for judgment notwithstanding the verdict ("JNOV") on October 27, 2004, requesting the court to set aside the verdict on count two, aggravated burglary. On October 28, 2004, appellant also filed a motion for a new trial.
 {¶ 18} At the December 1, 2004 sentencing hearing, appellant orally moved the trial court to merge, for purpose of sentencing, count one, aggravated robbery, count three, kidnapping, and count four, felonious assault, arguing that the three offenses were allied offenses of similar import committed with a single animus. Appellee agreed to merge the felonious assault count with the aggravated robbery count, but objected to merging the kidnapping count, contending that it was committed with a separate animus. The trial court agreed with appellee and granted appellant's motion with respect to merging count four, felonious assault, with count one, aggravated robbery, for purposes of sentencing, but not count three, kidnapping, finding that there was a separate animus for the kidnapping charge. Prior to sentencing, the trial court also denied appellant's motion for a new trial, but granted the JNOV with respect to count two, setting aside the verdict for aggravated burglary.
 {¶ 19} The trial court then sentenced appellant to serve nine years in prison on count one, aggravated robbery, nine years on count three, kidnapping, and one year on count five, tampering with evidence, on a consecutive basis, for an aggregate term of nineteen years. It is from that judgment that appellant filed a timely notice of appeal and makes the following assignments of error:
 {¶ 20} "[1.] The trial court erred by failing to give a jury instruction as to the affirmative defense of duress.
 {¶ 21} "[2.] The trial court's imposition of consecutive sentences upon appellant is contrary to law.
 {¶ 22} "[3.] The trial court's imposition of consecutive sentences upon appellant based upon findings not made by a jury nor admitted by appellant is contrary to law and violates appellant's rights to a jury trial and due process, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution."
 {¶ 23} In his first assignment of error, appellant argues that the trial court erred by failing to give the jury an instruction as to the affirmative defense of duress, since he provided unrebutted testimony that he "only acted in contravention of the law when ordered to do so by a group of individuals who informed [him] that his failure to follow their orders would result in immediate harm to his family."
 {¶ 24} It is within a trial court's sound discretion to determine whether the evidence presented at trial is sufficient to require a particular jury instruction. State v. Mitts
(1998), 81 Ohio St.3d 223, 228. An appellate court can only reverse a trial court's refusal to give a defendant's requested instruction upon a showing of abuse of discretion by the trial court. State v. Midwest Pride IV, Inc. (1998),131 Ohio App.3d 1, 15. We note that the term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v.Rock, 11th Dist. No. 2004-L-127, 2005-Ohio-6285, at ¶ 74.
 {¶ 25} The affirmative defense of duress has long been recognized as a legitimate defense to all crimes, with the exception of taking an innocent person's life. State v. Getsy
(July 15, 1998), 84 Ohio St.3d 180, 197. The defense of duress is extremely limited and should only be applied in rare instances.State v. Cross (1979), 58 Ohio St. 2d 482, 488. In order to successfully raise the defense, a defendant has the "burden of going forward with evidence of a nature and quality sufficient to raise" it. Getsy, supra, at 198. "Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of duress. If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." Id. at 198-199. Thus, before a trial court will instruct the jury on the defense of duress, it must find as amatter of law that evidence presented is sufficient to warrant an instruction on duress. Cross, supra, at 488. (Emphasis added.)
 {¶ 26} "One of the essential features of the defense of duress is a sense of immediate, imminent death, or serious bodily injury if the actor does not commit the act as instructed. * * * The force used to compel the actor's conduct must remain constant; controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw." Getsy, supra, at 199. (Citations omitted.) "All the conditions must be met," before the instruction is sufficiently warranted. Cross, supra, at 488. (Emphasis added.) If these conditions are not met, "[t]he court may refuse to give an instruction which is not applicable to the evidence governing the case * * *." Id.
 {¶ 27} In the instant case, after reviewing the record before us and applying the foregoing standard, we simply cannot say that the trial court, by not giving the jury appellant's proposed instruction on duress, acted unreasonably, arbitrarily or unconscionably. Appellant failed to satisfy his burden of presenting evidence of such nature and quality sufficient to raise the defense of duress and merit an instruction to the jury.
 {¶ 28} First, it is clear from reviewing the evidence, including appellant's own testimony, that the "force used to compel [his] conduct" was not constant and did not control his will "during the entire time" he committed the act. Getsy,
supra, at 199. Appellant stated that the man supposedly making him rob the store did not enter the store with him. He further admitted that he did not ask Leet for help, nor did he ask to use the phone to call the police or his family to check on them. He also admitted that the man did not tell him "to beat up the clerk." He admitted that the unidentified man did not tell him to "stomp on [Leet's] face." Appellant attempted to justify his action of nearly beating someone to death by testifying that, "I got caught up in the moment." Thus, it is apparent that the man who supposedly held him at gun point, making him rob Niles Book and News in order to pay back a $50,000 debt, did not control appellant's will "during the entire time he [committed] the act," nor was it "of such a nature that [appellant could not] safely withdraw." Id. It is clear from the evidence that appellant hadmany opportunities to withdraw and went way beyond what this unknown, unidentified man allegedly told him to do.
 {¶ 29} Furthermore, appellant did not inform Leet of his "imminent" doom when he had the opportunity, nor did he inform the police of any possible danger his family might be in, at least not until Officer Holland confronted him after viewing the surveillance tape. In fact, appellant told an entirely different story prior to the "Italian Mafia" story. Officer Holland testified, which was evidenced as well by the admitted dashboard video of the conversation: "[u]p to this point, after I gave him his Miranda rights, he told me that his dude, in his words, set him up, and he proceeded to tell me that a guy named Money * * * was following him. They left a couple girls' house down on North Road and they were traveling east on 422 and they stopped at the book store, and he stated when he got out of the car to go in the clerk was already laying on the floor and that his friend had done the assault and that he had tried to help the clerk but the clerk swung on him and tried to punch him, so then he punched him back. That's how the blood got on his coat." Officer Holland went on to state: "that's the story he stuck with until we were pulling into the police parking lot."
 {¶ 30} At that point, when they got to the police station, Officer Holland testified, which was also evidenced by the video tape, that appellant tried to make a deal with him. Officer Holland stated that appellant then "asked me if he could talk to anybody about drugs in Niles and trying to work out something as like to be an informant to get out of the situation."
 {¶ 31} When asked by the prosecutor, "[a]t some point then did he change his story[,]" Officer Holland replied yes, that after he reviewed the video surveillance tape from the store, he went back and told appellant what he had seen on the tape, and that it shocked him as a police officer. When confronted with this news, appellant still did not tell the police that his family was in danger or that someone in the "Italian Mafia" had made him commit the act.
 {¶ 32} According the police video, appellant's first response to Officer Holland was "you got to do what you got to do." After more prodding by Officer Holland, appellant went on to state that this was not his first time in jail, and that he knew how to get the surveillance tape "tossed." He insisted to Officer Holland that the tape would not be admissible in court. Before finally telling the "Italian Mafia" story, appellant made one last plea to Officer Holland, "tell me how you can help me now?"
 {¶ 33} At trial, appellant attempted to explain why he continued to lie to the police and why he did not ask for help during the numerous opportunities that he had to do so. He testified that "[e]verything I said to them basically had to do with getting them to stop that car and for me to get out of jail. I don't * * * have any reason to trust that the cops are going to protect my family better than I can." Admittedly, duress is available as a defense where the accused fears for the safety of others, particularly the members of his family, as well as himself. State v. Metcalf (1977), 60 Ohio App.2d 212, 216. However, one must still meet the other elements of duress. As discussed in the foregoing analysis, appellant failed to do so.
 {¶ 34} Thus, we conclude that the trial court did not abuse its discretion when it refused to give the duress instruction to the jury, as the evidence was not sufficient as a matter of law
to show that all of the conditions of duress had been met. As such, appellant's first assignment of error is not well-taken.
 {¶ 35} Appellant's second and third assignments of error challenge the consecutive sentence he received, and are impacted by the recent decision of the Supreme Court of Ohio in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856. In sentencing appellant, the trial court relied upon judicial fact-finding, formerly mandated by statute, but now deemed unconstitutional and void by the Supreme Court of Ohio in Foster. On that basis, appellant's second and third assignments of error are with merit.
 {¶ 36} In Foster, at paragraph three of the syllabus, the Supreme Court held that R.C. 2929.14(E) is unconstitutional for violating the Sixth Amendment because it deprives a defendant of the right to a jury trial, pursuant to Apprendi v. New Jersey
(2000), 530 U.S. 466, and Blakely v. Washington (2004),542 U.S. 296.
 {¶ 37} Further, pursuant to United States v. Booker (2005),543 U.S. 220, the Supreme Court's remedy was to sever the unconstitutional provisions of the Revised Code, including R.C.2929.14(E). After severance, judicial factfinding is not required before imposing consecutive sentences. Foster at paragraph four of the syllabus.
 {¶ 38} Since Foster was released while this case was pending on direct review, appellant's sentence is void, must be vacated, and remanded for resentencing. Foster at ¶ 103-104. Upon remand, the trial court is no longer required to make findings or give its reasons for imposing maximum, consecutive or more than the minimum sentences. Id. at paragraph seven of the syllabus.
 {¶ 39} Appellant's first assignment of error is without merit. Appellant's second and third assignments are well-taken. The judgment of the Trumbull County Court of Common Pleas is affirmed, except with respect to the sentence imposed. The sentence is vacated. This case is reversed and remanded for resentencing for proceedings consistent with this opinion pursuant to Foster.
William M. O'Neill, J., Diane V. Grendell, J., concur.