[Cite as *State v. Bolden*, 2016-Ohio-4727.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO. 2014-L-121 |
| ERRICK THERMAINE BOLDEN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 14 CR 000161.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Alana A. Rezaee,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Matthew C. Bangerter,* P.O. Box 148, Mentor, OH 44061 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Errick Thermaine Bolden, appeals his conviction, following a jury trial, in the Lake County Court of Common Pleas, of felonious assault. Appellant challenges the court's jury instruction, the court's denial of his motion to dismiss his court-appointed attorney, and the weight and sufficiency of the evidence. For the reasons that follow, we affirm.

{¶2}  On April 7, 2014, appellant was indicted for felonious assault, a felony of the second degree.  Appellant pled not guilty and the case was set for trial on May 5, 2014.

{¶3}  On April 23, 2014 and April 29, 2014, appellant filed pro se motions to dismiss his attorney, an assistant Lake County Public Defender.  Each motion was a verbatim duplicate of the other.  On April 29, 2014, appellant, through his attorney, filed a motion for a competency evaluation.

{¶4}  On April 29, 2014, the court held a hearing on appellant's motions to dismiss counsel.  The trial court denied the motions and continued the May 5, 2014 trial date due to appellant's request for a competency evaluation.

{¶5}  On May 5, 2014, the court granted appellant's motion for a competency evaluation, and referred him to the Lake County Adult Probation Department to be assessed by Dr. Jeffrey Rindsberg.  The court scheduled a competency hearing for June 12, 2014.

{¶6}  On May 7, 2014, Dr. Rindsberg prepared a report stating that, due to appellant's unwillingness to cooperate, he was unable to assess appellant's competence to stand trial.

{¶7}  On June 5, 2014, the court ordered appellant to be evaluated at Northcoast Behavioral Healthcare, and continued the June 12, 2014 competency hearing to July 15, 2014.

{¶8}  Dr. Kristi Osterling of Northcoast Behavioral Healthcare stated in her report that appellant was uncooperative and malingering, but, nevertheless, she concluded he was competent to stand trial.

**{¶9}** At the July 15, 2014 competency hearing, appellant's counsel stated that after reviewing Dr. Osterling's report, he had no basis to question it. However, appellant disputed the report, and thus the court referred him for another competency evaluation by Dr. James Eisenberg. Another competency hearing was scheduled for August 25, 2014, and, in the event the court found appellant to be competent, the trial was rescheduled to September 8, 2014.

**{¶10}** On July 25, 2014, appellant filed a pro se motion to dismiss the case, alleging his speedy trial rights were violated.

**{¶11}** Thereafter, Dr. Eisenberg verbally notified the court that he had met with appellant to conduct a competency evaluation, but that appellant refused to cooperate. As a result, the court scheduled the case for a status hearing on August 1, 2014.

**{¶12}** Based on Dr. Osterling's report and counsel's stipulation to the report, the court found appellant was competent to stand trial. The court also struck appellant's pro se motion to dismiss on speedy trial grounds since appellant was represented by counsel. The court found that appellant had been "'gaming the system' to exploit the rules in order to request dismissal on speedy trial grounds."

**{¶13}** The case proceeded to jury trial on September 8, 2014. Cathylean Crutcher testified she lives in a two-story townhouse in Seneca Grove, an apartment complex in Painesville. She said she lives alone with her three young children from a prior relationship. As of February 2014, she had been dating appellant for two months.

**{¶14}** Ms. Crutcher said that her close friend and neighbor, Kasey Acree, lives in another townhouse across the street in the complex. She said that Ms. Acree was dating Ms. Crutcher's brother, Brandon.

3

**{¶15}** Ms. Crutcher said that on February 21, 2014, at about 9:00 p.m., she picked up appellant at his friend's house. She could tell appellant had been drinking.

**{¶16}** Ms. Crutcher drove back to Seneca Grove and parked in a parking lot near her apartment. While she was parking, Ms. Acree drove into the complex with Brandon and pulled up next to her and appellant. Ms. Acree asked them if they wanted to come over to play dominoes and to have a few drinks and they agreed. Appellant went with them to buy a bottle of alcohol, and Ms. Crutcher waited for them in her apartment. At the time, her children were visiting their father at his home.

**{¶17}** When Ms. Acree, Brandon, and appellant returned, Ms. Crutcher joined them at Ms. Acree's apartment. While Brandon was setting up the dominoes on a table, appellant kept knocking them off onto Brandon's lap and the floor. Ms. Crutcher noticed that Brandon was becoming increasingly irritated with appellant's behavior. Because appellant was acting obnoxiously, Ms. Crutcher left Ms. Acree's apartment and appellant followed her to her home.

**{¶18}** Ms. Crutcher said that when she and appellant entered her apartment, she told him she had received a letter from the property manager advising her that, due to some recent incidents, appellant was no longer permitted to enter her apartment and that if he did, he would be trespassing.

**{¶19}** Ms. Crutcher then went upstairs to her bedroom and put her phone on the charger. After she went downstairs, her phone rang and appellant saw the call was from the father of Ms. Crutcher's children. Appellant started screaming obscenities at her. He yelled, "your f _ _ _ _ _ _ phone is ringing. It's your f _ _ _ _ _ _ baby daddy. B _ _ _ _, you probably been sucking his d _ _ _ all day."

4

{¶20} These comments angered Ms. Crutcher. She went upstairs to her bedroom and answered the phone. It was her son who used his father's phone to call her.

{¶21} After talking to her son. Ms. Crutcher told appellant he needed to mind his own business. With that, appellant "got into [Ms. Crutcher's] face." He grabbed her shirt and pulled her onto the floor. He took hold of her neck and choked her, resulting in visible red marks and bruising all around her neck. The state presented photographs documenting this injury.

{¶22} Ms. Crutcher told appellant to let her go, but he continued to choke her. In an effort to break away, she reached up and grabbed him. She got free and told appellant to leave. She told him she wanted her phone, but he did not give it to her so she went downstairs and left the house. As she left, she told him she was going to put him out of the house.

{¶23} Ms. Crutcher went to Ms. Acree's apartment and asked to borrow her phone. She said that appellant had her phone and would not give it to her.

{¶24} While walking to her front porch, Ms. Crutcher dialed her phone number on Ms. Acree's phone. At the same time, she saw appellant had put her television outside and was in the process of putting her second television on the side of the building. While he was doing this, she heard her phone ringing and saw her phone lighting up in appellant's pocket. She took her phone from his pocket and said, "you're not leaving with my phone."

{¶25} Appellant grabbed Ms. Crutcher's hand. She had both her phone and Ms. Acree's phone in her hand. She said appellant was trying to "snatch" Ms. Acree's

5

phone. While Ms. Crutcher was struggling with appellant trying to keep Ms. Acree's phone, she told him to let go of the phone. She eventually pulled away from appellant and ran into her apartment. However, appellant was right behind her at the door. She tried to shut the door on him and said, "you're not coming in here." Appellant was trying to get past the door and Ms. Crutcher was trying to close the door on him to keep him out. Suddenly, appellant grabbed her and then punched her with a closed fist in the jaw on the right side of her face.

{¶26} Ms. Crutcher heard her jaw crack and went to Ms. Acree's apartment. She asked her to call the police for an ambulance. Ms. Crutcher could not call herself because she was in great pain and was holding her jaw in place.

{¶27} Meanwhile, Brandon went to Ms. Crutcher's apartment looking for appellant, but he was gone. The police and ambulance arrived about two minutes later.

{¶28} Officer Brian Avery of the Painesville Police Department testified that at 11:00 p.m., he was dispatched to investigate an assault committed by a male named Errick Bolden against a female.

{¶29} As Officer Avery approached the apartment complex, he saw a male who he recognized as appellant walking on the street *away from* the complex. Appellant told him he was walking *to Seneca Grove*, but this was inconsistent with the direction Officer Avery saw him walking. In response to the officer's questions, appellant denied having been at the apartment complex recently or having been involved in an incident there that evening. Officer Avery detected an odor of alcoholic beverage on him.

{¶30} Officer Avery said he transported appellant to the scene. At that time, Ms. Crutcher was in front of her apartment. Although she was in great pain, she told Officer

6

Avery that appellant had injured her severely enough that she thought her jaw was broken. The officer then arrested appellant.

{¶31} Captain Robert Mrosko, a paramedic with the Painesville Fire Department, testified that Ms. Crutcher's right jaw was swollen and deformed. He said she was crying and obviously in great pain. He said that once he and his partners put Ms. Crutcher on a stretcher and brought her inside the ambulance, they put her head in a cervical collar to stabilize her jaw.

{¶32} Ms. Crutcher was taken by ambulance to Tri-Point Medical Center in Concord. Before she was seen by medical staff, Officer Avery met her in the hospital. She could not write out a statement because she was in such great pain. She also had difficulty speaking and could only speak through her teeth. She told Officer Avery what had happened and he wrote out her statement. Ms. Crutcher read and signed it.

{¶33} Ms. Crutcher's emergency room nurse, Maria Lazuka, testified she gave her morphine twice, but the paid was so intense, it did not help so, finally, she gave her Dilaudid, which eased her pain.

{¶34} Dr. Frank Greicius, the radiologist who read the CT scan, said Ms. Crutcher sustained a horizontal fracture through the mandible or jaw bone. He said the mandible is a sturdy bone, and it would take a "good blow" to break it. He said this injury was "significant" and would not have resulted from bumping against a hard object, such as a refrigerator. He said Ms. Crutcher's injuries required surgery during which the fracture fragments were fastened together with a metal plate to allow her bone to fixate and heal properly. The state presented photographs of Ms. Crutcher's jaw prior to and post-surgery.

7

**{¶35}** Since the injury, Ms. Crutcher has had many problems with her jaw. As of the trial date, which was seven months after the assault, her mouth was still numb from her jaw to her lips. As a result, she cannot eat properly. Her surgeon advised her that she sustained nerve damage from the assault and he had no idea when the numbness will subside.

**{¶36}** After Ms. Crutcher had surgery, appellant started sending her letters and calling her from jail. As a result, on February 24, 2014, she obtained a protection order from the Painesville Municipal Court, requiring appellant to cease all contact with her. However, despite this order, he continued to send her letters nearly every other day and to call her from jail.

**{¶37}** Captain Ron Walters, Detective Bureau Commander for the Lake County Sheriff's Office, testified that when an inmate attempts to call a person outside of the jail, before the call can proceed, a tape-recorded message is played for the recipient advising him that an inmate at the jail is attempting to call him and that if he wishes to accept the call, he must so indicate by pressing a number. Captain Walters said that between the date appellant was arrested, February 21, 2014, and the date trial began, September 8, 2014, appellant tried to call Ms. Crutcher 1,109 times and she did not accept any of these calls.

**{¶38}** As a result, appellant resorted to another plan to make telephone contact with her. He would call one of his friends or relatives from jail, and, after they accepted the call, he would have that person call Ms. Crutcher while appellant waited on the line. Once Ms. Crutcher was on the line, appellant would call her "Bae," and talk to her like she was his girlfriend. Each time, she told him that she was not his "bae" and that he

8

was not supposed to be calling her. Ms. Crutcher said appellant continued to make such calls up to the night before the trial began.

{¶39} In the 50 or so letters appellant sent to Ms. Crutcher from jail, several of which were offered in evidence, appellant told her to "get this case off me." He said if she did, he would buy her a house, cars, and clothes. He told her to tell the prosecutor that this was an accident caused by a fall and that she was upset with appellant because she thought he was talking to his wife. He told her what she had to do and say to recant her testimony. He told her to write a statement saying this was an accident and to send a copy to the Judge and prosecutor. Ms. Crutcher testified she refused to do so.

{¶40} Ms. Crutcher said that she never fell at any time during the struggle at the front door and that this was no accident. She said appellant was in a fit of rage because he thought her children's father had called her. She said that since this incident, she made no effort to communicate with him.

{¶41} During Ms. Crutcher's testimony, appellant blurted out that he did not want his attorney to represent him. Despite the court's admonition, he told the judge he would not keep quiet. As a result, the court made him observe the trial and communicate with his attorney in a secured conference room until he agreed to behave.

{¶42} Although appellant's counsel strongly urged appellant on the record not to testify due to his extensive criminal record, appellant chose to testify on his own behalf. Once appellant took the stand, he told the judge he wanted to ask the jury questions during his testimony. When the court explained to appellant that the court's procedure required him to only answer the attorneys' questions, appellant said in front of the jury,

9

"you all have evidence you won't give me." Later, when his attorney explained to him that he could not repeat hearsay testimony, appellant said in front of the jury, "He against me."

**{¶43}** Appellant admitted he has a lengthy criminal record and is currently on post-release control. In 2011, he was convicted of attempted felonious assault, a third-degree felony. He was released from prison in 2013, and was on post-release control when he committed the instant offense.

**{¶44}** Appellant's testimony was internally inconsistent and confusing. He testified that after he and Ms. Crutcher left Ms. Acree's apartment, they never got into an argument that night. He said that Ms. Crutcher never touched him, yet, he also said that Ms. Crutcher grabbed his phone and started hitting and kicking him in the doorway.

**{¶45}** Appellant said that at one point, they slipped in the doorway, but neither of them ever fell or hit the ground. He said he does not know how Ms. Crutcher injured her jaw, but that he never punched her. He said he did not know if she hit her head on anything.

**{¶46}** On cross-examination, appellant admitted he wrote letters from jail to Ms. Crutcher saying he was jealous and asking her to change her testimony.

**{¶47}** Appellant also admitted that on April 25, 2014, one week before the first scheduled trial date, he made a telephone call from jail to his friend, Ralph Martin, and asked Martin to call appellant's daughter, appellant's friend, and appellant's uncle, telling them to call Ms. Crutcher and to tell her not to "go to court against" him.

**{¶48}** Appellant said he never received a protection order requiring him to have no contract with Ms. Crutcher. However, when the prosecutor showed him the

10

protection order and his signature on it indicating he was served with it in court, he admitted he received it. He also admitted that, although he knew he was ordered to have no contact with Ms. Crutcher, he continued to phone and write her letters trying to get her to either not go to court or to change her testimony.

{¶49} The jury found appellant guilty of felonious assault as charged in Count 1. At sentencing, the trial court noted that between 2001 and 2008, he was convicted of domestic violence four times. In 2005, he was convicted of aggravated theft, a felony. In 2007, he was convicted of having a weapon while under disability. Later in 2007, he was convicted of two counts of felony trafficking in cocaine. The trial court sentenced him to serve eight years in prison with an additional one year in prison because he was on post-release control at the time he committed the instant offense, the two terms to be served consecutively to each other, for a total of nine years in prison. Appellant appeals, asserting four assignments of error. For his first, he alleges:

{¶50} "The trial court erred by failing to instruct the jury on the lesser included offense of assault."

{¶51} A lesser-included-offense instruction is not warranted every time "some evidence" is offered to support the lesser offense. *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). Rather, there must be "sufficient evidence" to allow the jury to acquit the defendant on the indicted offense and to find him guilty on a lesser included offense. *Id.* at 632-633. Whether the evidence presented at trial is sufficient to require a particular instruction is a determination that falls within the sound discretion of the trial court. *State v. Strickland*, 11th Dist. Trumbull No. 2005-T-0002, 2006-Ohio-2498, ¶24, citing *State v. Mitts*, 81 Ohio St.3d 223, 228 (1998). As a result, this court will not disturb a ruling of the

11

trial court absent an abuse of discretion. *Id.* We acknowledge, however, that the Supreme Court of Ohio has also held that a charge on a lesser-included offense is required when the facts warrant it. *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶20. It is obviously difficult to reconcile these two concepts. On the one hand, an instruction is required if warranted by the evidence. Yet, on the other, the court has discretion to refuse to give it. Despite this apparent inconsistency, the Supreme Court in *Wine, supra,* made it clear that discretion remains a part of the standard of review. The Court held that whether to give a jury instruction on a lesser-included offense lies within the discretion of the trial court and depends on whether the evidence could reasonably support a jury finding of guilty on a lesser-included offense. *Id.* at ¶1.

**{¶52}** Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another." He sought a jury instruction on assault under R.C. 290313(B), which provides that "[n]o person shall recklessly * * * [c]ause serious physical harm to another."

**{¶53}** The only distinction between felonious assault and assault as defined at R.C. 2903.13(B) is the culpable mental state. Felonious assault requires evidence that the defendant acted "knowingly," while assault under R.C. 2903.13(B) only requires evidence that he acted "recklessly." A person acts knowingly when "he is aware that his conduct will probably cause a certain result." R.C. 2901.22(B). In contrast, a person acts recklessly when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result." R.C. 2901.22(C).

12

**{¶54}** The trial court engaged in a lengthy analysis on the record in deciding not to charge the jury on reckless assault. The court noted the evidence showed appellant acted knowingly. Ms. Crutcher testified appellant punched her with his closed fist. Dr. Greicius testified that the mandible is a sturdy bone and that it would take a powerful blow to break it. In contrast, the court noted there was no evidence that appellant recklessly assaulted Ms. Crutcher. Appellant testified he does not know how Ms. Crutcher injured her jaw, but that he did not punch her. He also said Ms. Crutcher did not fall and he does not know if she hit her head on anything.

**{¶55}** Appellant argues in his brief that Ms. Crutcher may have hit her head; however, he concedes this is nothing more than speculation.

**{¶56}** The testimony of the state's witnesses provided evidence that appellant acted knowingly, i.e., he was aware that punching Ms. Crutcher in the jaw with a closed fist would probably cause serious injury. Moreover, there was no evidence that appellant acted recklessly. Under any reasonable standard, there was insufficient evidence for the trier of fact to find appellant not guilty of felonious assault and guilty of reckless assault. We therefore hold the trial court did not abuse its discretion in deciding not to charge the jury on reckless assault.

**{¶57}** Appellant's first assignment of error is overruled.

**{¶58}** For his second assigned error, appellant alleges:

**{¶59}** "The trial court erred to the prejudice of the defendant-appellant when it denied his repeated requests for substitute counsel."

**{¶60}** Appellant filed two motions to dismiss his counsel, each being an exact copy of the other. The court held a hearing on the motions on April 29, 2014. In the

13

court's judgment, the court confirmed it held a hearing on the motions and denied them "[f]or the reasons stated on the record." However, appellant did not order that hearing to be transcribed and, thus, we do not know what was presented or the reasons why the court denied the motions.

{¶61} The duty to provide a transcript for appellate review falls upon the appellant. This is because an appellant has the burden to show error by reference to matters in the record. *State v. Skaggs*, 53 Ohio St.2d 162, 163 (1978). This principle is recognized in App. R. 9(B), which provides that "* * * the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for inclusion in the record * * *." "'When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm.'" *State v. Locke*, 11th Dist. Lake No. 2014-L-053, 2015-Ohio-1067, ¶90, quoting *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980).

{¶62} Because appellant failed to file the transcript of the hearing on his motions to dismiss counsel, there is nothing for us to consider. We thus have no choice but to presume the validity and regularity of the trial court's hearing on the motions and affirm the court's ruling.

{¶63} Moreover, even if the issue was properly before us, appellant does not reference anything in the record before us supporting his motions to dismiss his counsel, in violation of App.R. 16(A)(7). We are not obligated to comb the record to try to find evidence to support his argument.

14

**{¶64}** Appellant refers to an exchange between him, the trial court, and his attorney as evidence that the trial court should have dismissed his court-appointed counsel, but, again, he does not cite the record in support. We thus have no idea as to which exchange among the various exchanges he is referring to. In any event, our review of the record does not support his argument.

**{¶65}** "An indigent defendant has the right to professionally competent, effective representation, not the right to have a particular attorney represent him." *State v. Evans*, 153 Ohio App.3d 226, 2003-Ohio-3475 (7th Dist.). In order to warrant substitution of counsel, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. *State v. Coleman*, 37 Ohio St.3d 286 (1988), paragraph four of the syllabus. "Only in the most extreme of circumstances should appointed counsel be substituted." *State v. Glasure*, 132 Ohio App.3d 227, 239 (7th Dist.1999).

**{¶66}** There must be a legitimate reason for the defendant's lack of confidence in his attorney because good cause for dismissal cannot be determined solely according to the subjective standard of what the defendant perceives. *State v. Julious*, 4th Dist. Scioto No. 96CA2409, 1996 Ohio App. LEXIS 5561, *6 (Dec. 5, 1996). For example, a total lack of communication between the attorney and client could be a basis for substitution of counsel. *State v. Murphy*, 91 Ohio St.3d 516, 523 (2001).

**{¶67}** However, mere hostility, tension, and personal conflicts between a defendant and his attorney are not "a total lack of communication" if those interpersonal problems do not interfere with the preparation or presentation by counsel of a competent defense. *Evans, supra*, at ¶32, citing *State v. Henness*, 79 Ohio St.3d 53,

15

65-66 (1997). Disagreement between the attorney and client over trial tactics or approach also do not warrant a substitution of counsel. *Glasure, supra.* Moreover, a total lack of communication preventing an adequate defense must be a permanent, rather than a temporary, state of affairs between the attorney and the client. *Cowans* at 73.

{¶68} We review the trial court's decision regarding substitution of counsel for an abuse of discretion. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, P135.

{¶69} During one exchange between appellant, his attorney, and the court, which took place during jury selection, while the jury was not present, appellant blurted out: "I don't feel he should be my lawyer. I don't feel he's for me. * * * I don't feel comfortable with him." When the judge asked him if his attorney had not done something he wanted him to do, he said his attorney did not get Ms. Crutcher's medical records or the preliminary hearing transcript. However, counsel told the court he had already obtained and reviewed both.

{¶70} During another exchange, after appellant's attorney finished cross-examining Ms. Crutcher and while the jury was still empanelled, appellant blurted out, "I don't want him as my lawyer." After the court removed the jury, appellant told the court that he did not want his attorney to represent him because he was "reeking of alcohol." Following this exchange, the court told appellant that he had smelled his attorney's breath and that, not only did it not reek of alcohol, he did not detect a scintilla of alcoholic beverage on his breath. In finding appellant's complaint was not legitimate, the court found that appellant "will resort to lying in order to disrupt the trial, in order to get [his attorney] off the case."

{¶71} Significantly, the record reflects that during his cross-examination of the state's witnesses, appellant's counsel regularly consulted with appellant. Thus, there was no "total lack of communication [between attorney and appellant] preventing an adequate defense."

{¶72} Based on our review of the record, appellant was uncooperative with the mental health experts, the court, and his counsel throughout the proceedings. He seemed determined to delay and disrupt the trial, and even lied to the court about his attorney drinking alcohol during trial in order to remove him. Despite appellant's wild and baseless accusations concerning his attorney, counsel aggressively cross-examined the witnesses and presented a sound and competent defense. Appellant's animosity toward his attorney was based on his personal feelings toward him, rather than any actual deficiency in his performance as counsel. Thus, even if the issue was properly before us, the trial court did not abuse its discretion in not removing counsel.

{¶73} Appellant's second assignment of error is overruled.

{¶74} Because his third and fourth assigned errors are related, we shall consider them together. They allege:

{¶75} "[3.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

{¶76} "[4.] The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A)."

{¶77} An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential

17

elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). Whether the evidence is legally sufficient to sustain a verdict is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶78}** In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *Id.* at 387. The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Witness credibility rests solely with the finder of fact. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Thompkins, supra*, at 390.

**{¶79}** First, we note that appellant presented no argument challenging the sufficiency of the evidence. Specifically, he did not argue that the state's evidence was lacking with respect to any of the elements of felonious assault. For this reason alone, appellant's sufficiency argument lacks merit. In any event, appellant concedes Ms. Crutcher suffered serious physical harm, and we agree with the trial court's finding that the state presented ample evidence in support of each element of felonious assault.

{¶80} The only manifest-weight argument asserted by appellant is that the state's failure to produce any surveillance video of the front of Ms. Crutcher's apartment, as he requested, "injected some doubt into the case."

{¶81} However, at Officer Avery's request, just one week after the assault, one of the day officers, Officer Kuhn, asked Margie Munnings, the property manager for Seneca Grove, for any available surveillance video showing the front of Ms. Crutcher's apartment during the evening of February 21, 2014. Contrary to appellant's argument, Ms. Munnings said she told Officer Kuhn that no such video was available because there was some sort of malfunction in the security camera system at that time, although she could not remember the specifics of that malfunction. In any event, she said that even if there was no such malfunction, she told the officer that no such video was available because there is no camera anywhere on the property that is directed toward the front entrance of Ms. Crutcher's apartment. She said their camera system is set up to film the parking areas, not the individual apartments.

{¶82} Further, as the trial court correctly noted, the apartment complex is private property and appellant had the same access to any surveillance video as the police. Thus, if appellant felt it might have been helpful to him, he could have subpoenaed it for trial, but he never did. In any event, the jury, as the trier of the fact, was entitled to decide, as it obviously did, that the testimony of the state's witnesses was more credible than that of appellant, a career criminal with a prior conviction of attempted felonious assault who was on post-release control at the time of this offense.

{¶83} We therefore hold the state presented sufficient, credible evidence to support appellant's conviction.

**{¶84}** Appellant's third and fourth assignments of error are overruled.

**{¶85}** For the reasons stated in this opinion, the assignments of error lack merit and are overruled. It is the order and judgment of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

COLLEEN MARY O'TOOLE, J., concurs,

TIMOTHY P. CANNON, J., concurring in judgment only.

_____

TIMOTHY P. CANNON, J., concurring in judgment only.

**{¶86}** Our standard of review with regard to a trial court's decision to instruct on a lesser included offense was discussed by the Ohio Supreme Court in *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948. I believe that discussion is in need of clarification.

**{¶87}** At the beginning of the opinion, the *Wine* Court states:

> The issue we address in this case is whether a defendant who presents an 'all or nothing' defense in a criminal trial has the right to prevent a trial court from giving lesser-included-offense jury instructions. We hold that a criminal defendant does not have the right to prevent a trial court from giving lesser-included-offense jury instructions; *whether to include such jury instructions lies within the discretion of the trial court* and depends on whether the evidence presented could reasonably support a jury finding of guilt on a particular charge.

*Id.* at ¶1 (emphasis added).

**{¶88}** As recognized in *Wine*, there are many cases that address the standard for giving jury instructions on lesser included offenses, and it is clear that the law is, for

20

the most part, mandatory in nature. If the evidence supports an acquittal of the charged offense and guilt of the lesser included, instruction on the lesser included offense is required. The *Wine* Court acknowledged other cases to this effect throughout the opinion:

> 'Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is *required* only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.' *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. In determining whether lesser-included-offense instructions are appropriate, 'the trial court must view the evidence in the light most favorable to the defendant.' *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶37.

*Id.* at ¶21.

{¶89} The Court further noted, "'if the trier could *reasonably* find against the state and for the accused upon one or more of the elements of the crime charged and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense, *then a charge on the lesser included offense is both warranted and required*, not only for the benefit of the state but for the benefit of the accused.'" *Id.* at ¶24, quoting *State v. Nolton*, 19 Ohio St.2d 133, 135 (1969) (emphasis added).

{¶90} The *Wine* Court clarified its holding to some extent by stating the following: "This court has therefore left no doubt that it is the quality of the evidence offered, not the strategy of the defendant, that determines whether a lesser-included-offense charge should be given to a jury." *Id.* at ¶26.

> But Wine nevertheless maintains that a defendant has the right to prevent a trial court from giving the jury lesser-included-offense instructions, and he bases that contention on a statement in a

footnote in *State v. Clayton*, 62 Ohio St.2d 45 (1980), in which this court referred to a defendant's right to waive a lesser-included-offense jury instruction. The context of the court's statement is crucial. In *Clayton*, the defendant's counsel had successfully persuaded the trial court not to give lesser-included-offense jury instructions, so the trial court had instructed on attempted murder only and on self-defense. The trial court had noted on the record: 'Let the record show that in a discussion with counsel in chambers as to the charge of the court, as to crime involved in this, that at the request of the defense the court is charging on attempted * * * murder and no lesser included offense.' *Id.* at 45, fn. 1.

The issues this court faced [in *Clayton*] were whether the trial court had committed plain error in failing to include lesser-included-offense jury instructions and whether Clayton's counsel's argument to the court to omit those instructions constituted ineffective assistance of counsel. *Id.* at 46. Thus, *Clayton* was a much different case from the case before us: in *Clayton*, the defendant claimed that the trial court erred in not instructing the jury on lesser included offenses, whereas here Wine argues that the court erred in giving lesser-included-offense instructions.

*Id.* at ¶26-27.

{¶91} In the *Clayton* case, counsel did not want the lesser included instruction, and the court did not give it. In the *Wine* case, counsel did not want the lesser included instruction, but the court did give it.

{¶92} "The sole issue before us is whether a criminal defendant has the right to prevent a trial court from instructing a jury on lesser included offenses. We hold that a defendant does not have that power. The trial court, after reviewing the evidence, determines whether an instruction on lesser included offenses is appropriate. *The trial court must give an instruction on a lesser included offense* if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *Id.* at ¶34 (emphasis added).

**{¶93}** The trial court must consider whether the evidence, viewed in a light most favorable to the defendant, is sufficient. If it is, *Wine* **requires** a lesser included offense instruction. In that event, the decision to give the instruction is clearly not discretionary.

**{¶94}** The majority concludes that whether "the evidence presented at trial is sufficient to require a particular instruction is a determination that falls within the sound discretion of the trial court." Indeed, there is some authority for this proposition, including the *Wine* decision. Because, however, the issue of whether to instruct a jury on a lesser included offense is a matter of law, these authorities mistake, whether by accident or oversight, the correct standard. An analysis of sufficiency is a legal analysis, not one subject to discretion. The trial court must give the instruction if the lesser included test is met. It is essentially a sufficiency of the evidence analysis, which we review de novo as a matter of law. If the *Wine* Court intended to carve out an area of the law where the trial court has discretion to determine "sufficiency," it should have expressly stated it was doing so.