[Cite as *State v. Cowan*, 2022-Ohio-4241.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2022-T-0023 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| DARRYL COWAN, JR., | |
| Defendant-Appellant. | Trial Court No. 2021 CR 00562 |

**O P I N I O N**

Decided: November 28, 2022
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*James P. Gilbride*, 100 North Avenue, Suite 103, No. 200, Tallmadge, OH 44278 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Darryl Cowan, Jr., appeals the judgment sentencing him to 18 months of imprisonment after a jury found him guilty of trespass in a habitation when a person is present or likely to be present. We affirm.

{¶2} In 2021, Cowan was involved in an altercation at an establishment known as That 1 Club ("the club") stemming from allegations that Cowan attempted to exchange counterfeit $50 and $100 bills with exotic dancers at the club. During the altercation, Cowan was maced. He fled the club on foot and was pursued by the dancers. Ultimately,

Cowan entered the nearby residence of James and Debra Holbrook. The Holbrooks' nephew, Patrick Dewsberry, who lives next door to them, called police to report Cowan in the home. Officers arrived and called paramedics to treat Cowan for mace and then placed him under arrest.

{¶3} Thereafter, Cowan was indicted on charges of robbery, a third-degree felony, in violation of R.C. 2911.02(A)(3), trespass in a habitation when a person is present or likely to be present, a fourth-degree felony, in violation of R.C. 2911.12(B), and counterfeiting, a fourth-degree felony, in violation of R.C. 2913.30(B)(2). Cowan pleaded not guilty, and the case proceeded to jury trial. The jury acquitted Cowan on the robbery and counterfeiting charges but found him guilty on the trespass in a habitation charge. At sentencing, the trial court imposed an 18-month term of imprisonment.

{¶4} Cowan assigns three errors, which we consolidate for discussion.

> [1.] The trial court erred to the prejudice of Cowan when it abused its discretion by denying Cowan's requested jury instruction regarding duress as an affirmative defense.
>
> [2.] The trial court erred to the prejudice of Cowan when it denied Cowan's Rule 29 Motion for Acquittal because there is insufficient evidence to support a guilty verdict for Trespassing in a Habitation When Another Person is Present.
>
> [3.] The trial court erred to the prejudice of Cowan when it entered a judgement of guilty for Trespassing in a Habitation When a Person is Present because such a verdict is against the manifest weight of the evidence.

{¶5} In his assignments of error, Cowan argues that the trial court erred by failing to instruct the jury on duress and that his conviction is based upon insufficient evidence and is against the weight of the evidence because he was acting under duress when entering the Holbrooks' home.

2

**{¶6}** Cowan was convicted of trespass in a habitation when another is present or likely to be present in violation of R.C. 2911.12(B), which provides that "[n]o person, by force, stealth, or deception, shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present."

**{¶7}** In support of the charge, at trial, the state presented the testimony of Dewberry, Mrs. Holbrook, and two officers who responded to the Holbrook residence. Dewberry testified that, on the evening at issue, he observed two unknown women in his driveway. He walked outside to investigate, and the two women walked quickly to the Holbrook house, where his elderly aunt and uncle reside. Dewberry asked the women outside what was happening, and the women appeared upset, were speaking in loud and excited voices, and yelled that someone had just run inside the Holbrooks' home, pointing to the back of the residence. Dewberry entered the front of the Holbrooks' home, where his aunt and uncle and their friend were seated in the living room watching television. Dewberry informed them that a stranger was in their home and instructed them to remain where they were while he searched for the intruder. When Dewberry reached a spare bedroom in the back of the home, he saw Cowan sitting on the bed, wiping his eyes. Cowan told Dewberry that he had been maced and beaten, and his cell phone was stolen.

**{¶8}** On cross-examination, Dewberry acknowledged that in his statement to the police, he indicated that Cowan had instructed him to call the police, although Dewberry could not recall Cowan having made that statement at the time of trial.

**{¶9}** Mrs. Holbrook testified that, on the evening at issue, Dewberry came into her home and advised the occupants that there was an intruder in the home. Mrs.

3

Holbrook maintained that she had not given anyone permission to enter their home that night, and she was shocked. After a few minutes, she found Dewberry standing outside the bedroom, and she looked in the room and saw Cowan sitting on the bed. She had never seen Cowan before and had not given him permission to come into her house.

{¶10} Officer James Johnson testified that he was the first officer that responded to the Holbrooks' residence. There were women outside the residence who appeared very upset. The women informed the officer that there had been an incident at the club, where Cowan had given them counterfeit bills. When the women discovered that the bills were fake, the boyfriend of one of the club's dancers confronted Cowan, and Cowan punched the dancer's boyfriend in the face. The dancers then maced Cowan, who had somehow obtained one of the dancer's car keys and ran out of the club and into the woods. The dancers pursued Cowan and saw him run through the back door entrance of the Holbrooks' residence.

{¶11} Officer Chad Baron testified that he arrived at the Holbrooks' residence after Officer Johnson. Cowan was still located in the bedroom, and he appeared sweaty, shirtless, out-of-breath, and exhausted. Officer Baron escorted Cowan to his cruiser, and gave him a pat-down search, during which the officer found a car key that he turned over to Officer Johnson. Cowan requested an ambulance for treatment for mace, and the officers called for EMTs. Officer Baron did not see any bleeding on Cowan, although he may have had minor scratches. Once cleared by the EMTs, Officer Baron placed Cowan under arrest.

{¶12} After the state rested, Cowan moved for a Crim.R. 29 judgment of acquittal, which the trial court overruled.

4

{¶13} Thereafter, Cowan testified in his own defense. Cowan maintained that he went to the club on the day at issue with his friends. He asked a woman in the pool area for change for a $20 bill. She went to the back of the club, got Cowan change, and brought it back to him. Cowan and his companions then played pool and drank. About forty minutes later, the woman returned to Cowan's group and was acting frantic. She addressed the room inquiring about counterfeit money, and then singled out Cowan, stating he had given her money for change. However, Cowan maintained that he had only two $20 bills for which he had received change at the club. Cowan testified that he and two others in his group gave the woman $50 each to appease her. Thereafter, a man Cowan believed to be the woman's husband entered the room, accusing Cowan of taking the woman's money, and he was very combative. Cowan and the husband tussled for about five seconds before Cowan's friend broke up the fight. The woman then walked up to Cowan holding mace and a key, and she punched him in his face with mace, and another fight began. Cowan maintained that the woman was going "mace crazy" and everyone began attempting to leave the building. Cowan tried to make his way out the door while his eyes were burning, and someone was attacking him with keys.

{¶14} Cowan further testified that, after he exited the building, he could see the women entering a vehicle on the other side of the building, which they drove toward him. Cowan ran into a field so they could not follow him with the car. He tried to hide in the woods, but the women pursued him and spotted him. At that point, Cowan ran to the back of the Holbrooks' house. Cowan explained: "I wanted people, whatever neighbors was around to hear me so I was screaming help, help, someone help. So I ran to that

5

house. They met me at the door, they beat me some more with them damn keys or whatever like that." Thereafter, Cowan explained:

> And one of the keys wrapped my wrist and it smacked me right here and chipped my tooth. I got a chipped tooth from that tooth. Broke my tooth. And they yanked it and when they yanked it back, the key broke off, I'm knocking on the door with the other hand and defending with this arm which I got all these scars on it. The door wasn't closed all the way. The back door it opened and light poured out. They ran back around the front of the Holbrook[s'] house. I got up. I did pick the key up. I didn't really – I wasn't really sure whose it was or nothin' like that. I did pick it up and I'm knocking on the door, I'm saying, someone help, someone help and that's where two gentlemen appeared at the end of the hallway. I think it was the neighbor and a guy with a set of white hair.

{¶15} Cowan then testified that, upon seeing the men in the house:

> The first thing I said – I had to knock for a second 'cause it took them a little second to get to the other end of the hallway. I didn't want to just walk in their house and get shot 'cause as the lady already said – that's why I thanked me [sic] 'cause I didn't want to – I didn't want to bring that to nobody's house in the first place. I'm older now, you know what I mean. I ain't got time for the foolery no more but I was just scared for my life. The two gentlemen came at the end of the hall and I was, like, please call the police. Please. I said that to the – and neighbor paused for a minute. He was kind of, like, a deer in headlight. He, like, okay, I'm going to go call the police.
>
> * * *
> He went to the front to call the police and they left. And it was the older guy with the white hair that was back there with me. I don't know exactly who it was. And I asked him, I was, like, sir, can I please come in and wait until the police come, please. And he looked at me kind of unsure. And he was, like, mechanically said sit there. He pointed to a room off to the side of the hallway and that's where I sat until the police came. I don't know nothing about no rummaging or messin' – ain't got nothing to do with me.

{¶16} Cowan testified that he remained in the bedroom until the police arrived and arrested him. After he was released from jail about two weeks later, Cowan asked his

6

friend to take pictures of his injuries to his arms and his tooth. The pictures of Cowan's arms were admitted into evidence and depict what appear to be numerous healing scratches on his skin.

{¶17} On cross-examination, Cowan maintained he gave the woman at the club a total of $40 for change. When the woman returned to Cowan and his group with the counterfeit money about forty minutes later, Cowan saw her holding one $100 bill and one $50 bill that had Chinese characters on the front and back. Cowan and two of his friends each gave her $50 just to keep the peace. Cowan again explained the confrontation at the rear of the Holbrooks' house as follows:

> A. It's at the back of the Holbrook[s'] house.
>
> Q. Okay. So you're down on the ground, they're kicking and fighting with you at the back of that house?
>
> A. And they really just laying there with them keys. Then, it's like one the damn – one of them chains them keys hang off of and they just laying into me. I'm just, like – and I'm knocking at this – hitting at the door, help, help, and as I'm doing that, the door ends up just coming open, like, it wasn't closed all the way anyway. It's like simultaneously.
>
> Q. Okay. When the door comes open, that's when they took off running?
>
> A. Yeah. And the light poured out from the hallway, I guess, and they took off.
>
> Q. All right. And then you waited – you waited there until the owners of the house came or do you go inside?
>
> A. I was screaming help at the door entrance. I didn't step in but I stayed at the door entrance and I was, like, someone help me, please. Call the police, call the police. They trying to rob me and kill me. That's how I said it. They trying to rob me, they trying to kill me because I didn't know exactly what they wanted to be chasing me down like that.

7

Q. Okay. And you said two men let you in the house?

A. There was two males that came. There was one with white hair, a set of white hair, the older guy who seems a little bit mechanical and the guy that was on the stand earlier. Dewberry. It was him and he's the one who went up to the front and called and the police. I said, sir, can you please call the police. I just wanted the police to be called.

Q. Before we get to the fact that he got up and called the police, according to you, they let you in the house?

A. The old man said, sit there. He said it mechanical. I said, sir, can I please come in and wait until the police come, please. And he waited – he hesitated, looked at me and pointed to the room.

Q. And Dewberry was with him?

A. Huh?

Q. Dewberry was with him?

A. Dewberry went to the front –

Q. Okay.

A. – to call the police when I questioned, you know, like if you're head, like, I'm at the back door, you know, a battered man with his shirt off, I'm sure it did alert him. And I want to apologize to him. I didn't – and thank him. I didn't mean to scare him but I was, like, I was fight or flight. I didn't want – I didn't know what those people were going to do to me.

Q. All right. So they let you in and he tells you to sit in the bedroom and that's what you did?

A. He just said sit there. He pointed to the bedroom. He didn't say sit in the bedroom. He just said it mechanically sit – sit there.

{¶18} After Cowan's testimony, the defense rested and renewed its Crim.R. 29 motion, which the court again overruled. Subsequently, defense counsel requested an

8

Case No. 2022-T-0023

instruction on duress as a defense to the trespass in a habitation charge. The trial court determined that there was insufficient evidence to include the instruction.

{¶19} Cowan's first assigned error challenges the trial court's determination that a jury instruction on duress was not warranted.

{¶20} A jury instruction is proper when "'(1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the relevant law; and (3) the instruction is not covered in the general charge to the jury.'" *State v. Kovacic*, 2012-Ohio-219, 969 N.E.2d 322, ¶ 15 (11th Dist.), quoting *Mentor v. Hamercheck*, 112 Ohio App.3d 291, 296, 678 N.E.2d 622 (11th Dist.1996).

{¶21} "Duress is an affirmative defense to a criminal charge." *State v. Jordan*, 11th Dist. Trumbull No. 2009-T-0110, 2010-Ohio-5183, ¶ 25, *reversed in part on other grounds*, 128 Ohio St.3d 268, 2011-Ohio-737, 943 N.E.2d 565, citing *State v. Strickland*, 11th Dist. Trumbull No. 2005-T-0002, 2006-Ohio-2498, ¶ 25. "The defense of duress, however, is extremely limited and applicable only in certain rare circumstances." *Jordan* at ¶ 25, citing *Strickland* at ¶ 25, citing *State v. Cross*, 58 Ohio St.2d 482, 488, 391 N.E.2d 319 (1979). "A defendant may claim duress when [he] is compelled to commit a crime by another under threat of immediate imminent death or serious bodily injury." *Jordan* at ¶ 25, citing *State v. Getsy*, 84 Ohio St.3d 180, 199, 702 N.E.2d 866 (1998). "The force compelling the defendant must be constant, controlling the will of the unwilling offender during the entire commission of the criminal act and must be of such a nature that the offender is unable to safely withdraw." *Jordan* at ¶ 25, citing *Getsy* at 199. "In *Getsy*, the [Supreme Court of Ohio] further emphasized that the immediacy of the harm threatened is an essential element of the defense." *Jordan* at ¶ 25, citing *Getsy* at 199. "'All the

9

conditions must be met,' before a jury instruction on duress is sufficiently warranted." *Jordan* at ¶ 25, quoting *Cross* at 488. "If these conditions are not met, '[t]he court may refuse to give an instruction which is not applicable to the evidence governing the case * * *.'" *Jordan* at ¶ 25, quoting *Cross* at 488.

{¶22} Here, Cowan relies on his testimony as establishing sufficient evidence to warrant an instruction on duress. Assuming, without deciding, that Cowan's testimony regarding the women's physical attack on him constituted a threat of "immediate imminent death or serious bodily injury," the instruction was not warranted. Cowan claimed that he did not enter the Holbrooks' home until after the women fled the back of the house and after he received permission from a man in the Holbrooks' house to enter. Accordingly, Cowan's testimony failed to establish a constant force controlling his will and compelling him to enter the Holbrooks' residence. Therefore, Cowan's first assigned error lacks merit.

{¶23} Cowan next argues that based upon the evidence of duress, his convictions are based upon insufficient evidence and are against the manifest weight of the evidence. As these arguments are contingent upon this court finding merit to the argument raised in the first assigned error, his second and third assigned errors are without merit.

{¶24} The judgment is affirmed.


MARY JANE TRAPP, J.,

JAMES A. BROGAN, J., Retired, Second Appellate District, sitting by assignment,

concur.

Case No. 2022-T-0023